1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                   **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   IGNACIO CANELA,                    Case No.:  19cv1434-GPC (MSB)

12                          Petitioner,
                                        **ORDER:**
13   v.                                 **(1) DENYING PETITION FOR A**
                                        **WRIT OF HABEAS CORPUS AND**
14   KATHLEEN ALLISON, Secretary,       **(2) DENYING A CERTIFICATE OF**
                                        **APPEALABILITY**
15                          Respondent.

16

17          Ignacio Canela ["Petitioner"], is a state prisoner proceeding pro se and in forma

18   pauperis with a Petition for a Writ of Habeas Corpus filed under 28 U.S.C. § 2254.  (ECF

19   No. 1.)   Petitioner challenges his San Diego County Superior Court convictions for

20   attempted murder of a police officer, carrying a stolen, loaded firearm, evading an officer

21   with reckless driving, transport, possession for sale and/or possession of drugs (including

22   methamphetamine, hydrocodone, diazepam, and cocaine), possession of burglary tools,

23   possession of narcotics paraphernalia, and failure to appear while on bail, for which he was

24   sentenced to a determinate term of 14 years and an indeterminate term of 40 years to life.

25   (Id. at 2-3; see also Clerk's Transcript ["CT"] 396-400, 493-515, ECF No. 14-38,

26   Lodgment No. 5.)  Petitioner claims his federal constitutional rights were violated by the

27   trial court's revocation and termination of his constitutional right to self-representation just

28   prior to the start of trial.  (ECF No. 1 at 2, 6-8.)

Respondent has filed an Answer and has lodged the state court record.  (ECF Nos. 13-14.)  Respondent maintains that habeas relief is unavailable because the state court adjudication of Petitioner's claim on the merits is neither contrary to or an unreasonable application of clearly established federal law nor based on an unreasonable determination of the facts.  (ECF No. 13 at 3.)  Petitioner has not filed a Traverse.

For the reasons discussed below, the Court **DENIES** the Petition for a Writ of Habeas Corpus and **DENIES** a Certificate of Appealability.

## I.   PROCEDURAL BACKGROUND

In a consolidated amended Information filed on May 9, 2016, Petitioner was charged with fourteen counts arising from events that occurred on or about August 19, 2013 (counts 10-13), September 4, 2013 (count 14) and October 24, 2013 (counts 1-9), including: (1) willful, deliberate and premeditated attempted murder upon a peace officer and/or firefighter, (2) possession of a firearm by a felon, (3) possession of ammunition by a person prohibited from owning/possessing a firearm, (4) evading a peace officer with reckless driving, (5) carrying a loaded firearm on one's person, carrying a stolen loaded firearm in a vehicle, (6) transport of controlled substances, methamphetamine, (7) possession for sale of a controlled substance, methamphetamine, (8) possession of a controlled substance, hydrocodone, (9) possession of a controlled substance, diazepam, (10) possession for sale of a controlled substance, methamphetamine, (11) possession of a controlled substance, cocaine, (12) possession of burglary tools, (13) possession of paraphernalia used for narcotics, and (14) failure to appear while on bail.  (CT 326-32.)  It was alleged that the crimes charged in counts 1-9 and 14 were committed while Petitioner was on bail pending judgment on another felony.  (Id.)

It was further alleged that in the commission or attempted commission of count 1, Petitioner used a handgun, intentionally and personally discharged a firearm, caused great bodily injury and used a deadly weapon on a peace officer, that he was armed with a handgun at the time of the commission or attempted commission of counts 4, 6 and 7, and that with respect to counts 6 and 7, Petitioner had prior convictions of possession for sale.

(CT 326-30.)   It was also further alleged Petitioner had two or more prior felony convictions which constituted probation denial priors and four prior felony convictions which constituted prison priors.  (CT 333-34.)

On June 2, 2016, after a jury trial, Petitioner was found guilty on counts 1-9 and 11-14; the jury deadlocked 11-1 on count 10 but returned a guilty verdict on a lesser included offense of count 10.  (CT 492-94.)  The jury also returned true findings on the special allegations charged with respect to counts 1-9 and count 14.  (Id.)  Petitioner admitted the prior conviction of possession for sale of a controlled substance and the four prison priors. (CT 494.)  On June 22, 2016, Petitioner was sentenced to a determinate term of 14 years in prison and a consecutive indeterminate term of 40 years to life in prison.  (CT 396-400, 493-515.)

Petitioner appealed, raising the claim presented here.  (ECF Nos. 14-40, 14-41, 14-42, 14-43 and 14-44, Lodgment Nos. 7-11.)  On January 16, 2018, the state appellate court affirmed.  (ECF No. 14-45, Lodgment No. 12.)  Petitioner presented the same claim in a petition for review in the California Supreme Court, which was summarily denied on April 11, 2018.  (ECF Nos. 14-48, 14-49, Lodgment Nos. 15-16.)

On July 17, 2019, Petitioner filed his federal habeas petition.  (ECF No. 1.)  On October 10, 2019, Respondent filed an Answer and lodged the state court record.  (ECF Nos. 13, 14.)  The Court granted numerous subsequent requests by Petitioner for extensions of time in which to file a Traverse, to January 7, 2022.  (ECF Nos. 21, 23, 25, 27, 29, 31, 33, 40, 42, 46.)  On December 9, 2021, Petitioner filed a motion for a federal court order for post-conviction discovery and transcripts.  (ECF No. 49.)  On January 4, 2022, the assigned Magistrate Judge issued an order granting in part and denying in part Petitioner's motion and sua sponte extending the time in which to file a Traverse to February 16, 2022. (ECF No. 51.)  Upon consideration of Petitioner's January 6, 2022, filing of another request for extension of time (ECF No. 52) and Respondent's January 25, 2022, status report concerning production of the transcripts (ECF No. 53), on January 25, 2022, the Magistrate Judge set out a new deadline of February 9, 2022, for production of the transcripts and

granted an extension of time for filing the Traverse to April 6, 2022.  (ECF No. 54.)  On February 9, 2022, Respondent lodged the transcripts with the Court, and on that same day, the Magistrate Judge ordered copies of the transcripts sent to Petitioner.  (See ECF Nos. 55, 56.)

On April 5, 2022, Petitioner constructively filed a motion for stay and abeyance to exhaust unexhausted claims.  (ECF No. 57 at 8.)[1]  On April 29, 2022, Respondent filed a Response and on May 25, 2022, Petitioner filed a Reply.  (ECF Nos. 60, 63.)  On June 17, 2022, the assigned Magistrate Judge issued a Report and Recommendation ["R&R"] which recommended denying the motion for stay.  (ECF No. 64.)  After Petitioner filed three motions for extensions of time to file objections to the R&R (see ECF Nos. 67, 69, 71), two of which were granted by the assigned Magistrate Judge (see ECF Nos. 68, 70), on March 21, 2023, the Court issued an Order denying the third motion for extension of time to file objections, adopted the Magistrate Judge's R&R and denied Petitioner's motion for stay and abeyance.  (ECF No. 73.)  In the March 21, 2023, Order, the Court specifically noted that "Petitioner filed the present Motion for Stay and Abeyance one day before the operative traverse deadline" and provided Petitioner an additional 28 days from the date the order was issued, until April 18, 2023, to file the Traverse.  (Id. at 15.)  After Petitioner thereafter filed another request for an extension of time, the Court granted that request in part in a May 3, 2023, Order, and extended the deadline to file a Traverse one final time to May 30, 2023, noting the "leniency afforded to Petitioner throughout the course of this action," and recognizing in particular that Petitioner had at the time of that Order, "an additional three and a half years to prepare and file a Traverse." (ECF No. 75 at 2.)  To date, Petitioner has not filed a Traverse.

---

[1] While Petitioner's motion is filed-stamped April 11, 2022, the constructive filing date is April 5, 2022, the date Petitioner handed it to correctional officers for mailing to the Court. ECF No. 57 at 1, 8; see Houston v. Lack, 487 U.S. 266, 274-76 (1988) (filing of prisoner petition turns on date prisoner delivered filing to prison authorities for mailing and not when filing was received by court).

## II.     FACTUAL BACKGROUND

The following facts are taken from the state appellate court opinion affirming Petitioner's judgment in <u>People v. Canela</u>, D070607 (Cal. Ct. App. Jan. 16, 2018).  (ECF No. 14-45.)  The state court factual findings are presumptively correct and entitled to deference in these proceedings.  <u>See</u> <u>Sumner v. Mata</u>, 449 U.S. 539, 545-47 (1981).

A. <u>Prosecution Evidence</u>

1. *Counts 10–14*

Armando Solorio testified that he was working as a field training probation officer for the San Diego County Probation Department on or about August 19, 2013; and that he and his trainee, Deputy Probation Officer Zedrick Martin, went to an apartment located on Marlborough Avenue in San Diego to conduct a "Fourth waiver search" of, and an address verification for, defendant. On entering the apartment and contacting defendant, Solorio began his "protective sweep." The officers found in plain view a glass "meth pipe" in some male athletic shoes. On further inspection, they found "clear plastic baggies" inside the shoes that appeared to contain drugs. Because probation officers cannot "write up new cases," Solorio contacted the San Diego Police Department.

When police officers arrived, Solorio helped conduct a more thorough search of defendant's apartment. During this second search they discovered "burglary tools." Because these items constituted a probation violation, defendant was arrested. He subsequently "bonded out" and was "(r)eleased."

Items recovered from the search of defendant's apartment were analyzed and tested by a San Diego Police Department criminalist. One item was a plastic bag containing three separate bags, each of which "contained (a) white crystalline material," which weighed 7.84 grams. After performing "color, crystal, and instrumental" testing on the crystalline substances, the criminalist determined the bags contained methamphetamine. A second plastic bag also recovered in the search weighed .08 grams and, based on the same testing regiment, was found to be cocaine.

San Diego Police Officer Timothy Smith, a 26-year veteran of the San Diego Police Department who was also a member of the California Narcotics Officers Association and was "cross-sworn" with the DEA as a member of that agency, opined the 7.84 grams of methamphetamine was possessed for sale. Officer Smith based his opinion on the fact that one dose typically was

19cv1434-GPC (MSB)

about .1 grams; that a gram typically cost between $40 and $60; that the one bag held "three individual packaged weighted items inside of it;" and that rounding down to seven grams meant defendant possessed about 70 "usable dosages."

Martin testified that after the August 19 incident, defendant initially "reported" to probation but later failed to report for a follow-up as required under the terms of his probation. When Martin could not locate defendant, he requested a warrant for defendant's arrest. Defendant also failed to make his court appearance on or about September 4, 2013, after being arraigned on August 21 for the August 19 incident. Thus, the court also issued a warrant for defendant's arrest.

2. *(Counts 1–9)*

Christian Carranza, an agent with the Bureau of Tobacco, Firearms and Explosives, testified he worked as a United States Border Patrol agent in September 2013. On September 22, 2013 at about 7:00 p.m., Agent Carranza left his ground-floor apartment located on 40th Street in San Diego; that before he left, he placed his service-issued 18k Heckler & Koch (H&K) and his own Glock 26 firearms into a locked gun safe; and that he then secured the residence including locking his front door, a security door attached to the front entrance, and the gate between the residence and the street. When he returned home later that evening at about 11 p.m., Agent Carranza noticed his security door was "wipe [sic] open" and there were several window screens leaning against the home. Once inside, Agent Carranza saw his apartment had been ransacked. On inspection, Agent Carranza found the gun safe open and his two firearms and his agency credentials—including his badge—missing. Agent Carranza called police.

In October 2013, officers with the San Diego Police Department were attempting to locate defendant because of his outstanding felony warrants. On October 24, 2013, police believed they had located defendant. Before attempting to arrest defendant, however, about six police officers met in the Mission Valley area for a briefing. One of the officers who was going to participate in the arrest of defendant was Timothy Bell.

During the briefing, police learned defendant had been "sighted" and was "on the move." Lieutenant Adam Sharki notified the police helicopter to "come into the area and get overhead." Lieutenant Sharki was concerned defendant was armed and dangerous and thus, his arrest was high risk.

However, before the helicopter got overhead, officers began pursuing defendant in his car.

At some point during the pursuit, defendant stopped his car and proceeded on foot into a canyon. The police helicopter, which had joined the pursuit, broadcasted that defendant was "holding his side" as he ran. Because Lieutenant Sharki believed defendant was in fact armed, he directed those officers not in active pursuit to set a perimeter before a canine could be used to apprehend defendant.

Lieutenant Sharki testified that he heard several officers on the police radio "breathing heavily" as they pursued defendant. Shortly thereafter, the police helicopter radioed that defendant was approaching an officer in the canyon. That officer was Timothy Bell. The police helicopter next radioed that the officer had followed defendant into a tunnel or culvert. As Lieutenant Sharki headed down the canyon in that direction, he heard via radio that "shots had been fired." When he arrived on scene, Lieutenant Sharki found Officer Bell bleeding and other officers attending to him. Because of the seriousness of Officer Bell's condition, officers carried him out of the canyon and transported him to the hospital in a police car.

San Diego Police Officer Kevin Patrick was on patrol in his marked police cruiser in the afternoon of October 24, 2013. Officer Patrick received a dispatch that officers needed assistance to stop a "silver Dodge vehicle similar to a PT Cruiser" being driven by defendant, after two undercover officers had observed defendant come out of a house and leave in this car. Officer Patrick, along with several other patrol cars, intercepted the silver car, which entered the I-15 freeway heading north. While in the middle lane, the silver car unexpectedly swerved and exited the freeway at Adams Avenue.

Officer Patrick likewise exited the freeway, activated his police lights and siren, and attempted to stop defendant. Instead of stopping, however, defendant made a right turn on Adams Avenue and sped off through a residential neighborhood, reaching speeds of about 50 miles per hour. According to Officer Patrick, the police helicopter was still not in position to take over the coordination of the pursuit. With Officer Patrick in the lead car and other officers in pursuit, defendant drove into oncoming traffic lanes and around oncoming vehicles, ran several stop signs, and narrowly avoided hitting an elderly female, who dove "head first out of the way." During the pursuit, Officer Patrick reached speeds in excess of 80 miles per hour as he

followed defendant through various residential neighborhoods. Even at those speeds, defendant was pulling away from Officer Patrick's patrol car.

As defendant approached a dead end, Officer Patrick saw him pull into a driveway, jump out of the car as it continued to move slowly, and run into the canyon. A female passenger exited the passenger side of the car and raised her hands. As defendant ran, Officer Patrick noticed defendant "reach for his front waistband." Officer Patrick relayed this information via radio, as defendant's actions suggested he was armed.

As they gave chase, the police helicopter radioed that defendant was running toward a culvert or tunnel and that another officer approaching from the other side of the canyon was close to intercepting defendant. Shortly thereafter, the police helicopter radioed that defendant had entered the culvert with an officer in pursuit. Concerned for that officer's safety, Officer Patrick testified he and other officers ran toward the culvert.

When Officer Patrick was about 100 yards from the entrance to the culvert, he heard two gunshots, then about five or six more after a "quick pause." Officer Patrick saw "rounds impact the (dirt) outside" of the culvert. As Officer Patrick approached the culvert, he saw Officer Bell stagger outside, his arm completely soaked in blood. After collapsing to the ground, Officer Bell stated that he had been shot by defendant and that defendant had his gun.

Officer Bell testified at defendant's trial. On the day of the shooting, Sergeant Sharki asked Officer Bell if he wanted to participate in the stop and arrest of defendant, as Officer Bell had recently worked on the crime suppression team that had been looking for defendant. Officer Bell went to the staging location in Mission Valley, then left to join the pursuit after learning defendant was on the move. Officer Bell testified he was wearing a ballistic vest that day and had been told that defendant might be armed.

Officer Bell joined the pursuit near Adams Avenue. At that point, he was the last in a line of about nine patrol cars following defendant. Because his patrol included the mid-city area, Officer Bell was familiar with various streets taken by defendant during the pursuit. At some point, Officer Bell determined defendant was driving on a street that dead ended and abutted a canyon. He thus decided to approach the canyon from the west. Officer Bell testified that he made an "educated guess" defendant would "take() off down to the canyon" on foot.

Officer Bell heard the police helicopter overhead advise officers that defendant was running westbound in the canyon towards Officer Bell's location. As he went down the steep canyon, Officer Bell saw defendant about 100 yards away running in his general direction.

After descending the canyon, the police helicopter assisted Officer Bell in locating defendant. Officer Bell came upon defendant, who ignored his commands to stop and get to the ground. Officer Bell described defendant as being Hispanic, having black curly hair, and wearing baggy clothing and a hat. Officer Bell identified defendant in court as the man he chased in the canyon.

Officer Bell testified that he saw defendant "jump() into the drainage tunnel." Officer Bell followed. Once inside, Officer Bell approached defendant and "deployed (his) Taser" when he was about 10 feet from defendant. Although the lighting was not ideal, Officer Bell stated there was enough light coming through the opening of the culvert to see defendant, but not enough light to see whether the taser "barbs" had "hit the target."

Because the taser seemed to have little or no effect on defendant and because he continued to ignore Officer Bell's repeated command to lie on the ground, Officer Bell deployed the taser a second time. Officer Bell testified that he heard "noise" from the taser but once again observed no reaction to it by defendant. Defendant next got up and started towards Officer Bell. When defendant was about three feet away, Officer Bell again used his taser to "drive stun()" defendant. As before, Officer Bell saw the taser had little or no effect on defendant.

Officer Bell testified that he grabbed defendant and spun him around. With defendant's back to him, Officer Bell held defendant's arms to prevent defendant from using his hands. As he did so, Officer Bell yelled for defendant to stop resisting. Although defendant said, "I give up, I give up," defendant continued to resist Officer Bell. Because defendant was saying one thing and doing another, Officer Bell testified he next used his right knee to deliver a "few" blows to defendant to obtain compliance. Although he delivered these blows with force, Officer Bell testified they appeared to have little or no effect on defendant.

As Officer Bell attempted to use the microphone on his lapel to make radio contact, he felt himself losing his footing. Afraid defendant would fall on top of him, Officer Bell pushed defendant away. While on the ground,

Officer Bell saw defendant do a "quick spin" move and a muzzle flash. Officer Bell testified defendant shot him in the right abdomen. At the time, Officer Bell did not know that his protective vest had stopped the bullet. As Officer Bell reached for his service weapon, he heard more gun shots and realized defendant had shot him in the arm, causing Officer Bell to drop his weapon. Fearing he would be shot in the head, Officer Bell ran out of the culvert, which he described as "(r)unning towards the light, if you will."

After exiting the culvert, Officer Bell laid on his back in an attempt to stop the bleeding. Officers on scene applied a tourniquet to his arm, carried him up the canyon, and drove him to the hospital in a patrol car. Once at the hospital, Officer Bell realized he also had sustained gunshot wounds to his left leg and thigh region.

At trial, Officer Bell testified he continued to experience severe pain from nerve damage, lack of grip strength, and numbness in his arm as a result of being shot. Officer Bell also continued to experience pain from the gunshot wounds to his left leg and thigh area, which at times made walking and running difficult and painful. Although Officer Bell attempted to return to active police duty after being wounded, he was unable to do so. At the time of trial, Officer Bell was unemployed.

Shell casings found at the scene of the shooting were determined to have been fired from Agent Carranza's .40 caliber H&K semiautomatic weapon, as was the bullet lodged in the protective vest worn by Officer Bell. No bullets or casings from Officer Bell's service weapon were found at the crime scene.

San Diego Police Officer Mitchell Ford testified that shortly after the officer shooting, a woman reported a man, later identified as defendant, in her yard. Officer Ford and another officer went to the other side of the canyon and immediately saw a man jogging who matched defendant's description. When he was about three or four yards from defendant, Officer Ford drew his service weapon, pointed it at defendant, and ordered him to stop. Rather than stop, defendant "sprint(ed)" away.

Officers pursued defendant on foot. They saw defendant run on a path through some apartments and down a breezeway. During the pursuit officers lost sight of defendant. At the end of the path, Officer Ford saw legs sticking out of a bush. Officer Ford pointed his service weapon at defendant and demanded defendant show his hands. Despite shouting this command several

times, defendant did not respond. After other officers arrived on scene, San Diego Police Officer Jacob Kern pulled defendant out of the bush.

After being handcuffed, Officer Ford searched defendant for weapons but found none. Officer Ford did find a "concealed" pistol holder clipped to the inside of defendant's belt. Officer Ford also found on defendant's person a wallet containing defendant's driver's license and what was later determined to be $1,151 in cash; and a sunglass case or pouch containing a "baggie" of marijuana and about five bags of what appeared to be narcotics. Subsequent testing showed defendant at the time of his arrest possessed .79 grams of methamphetamine; .87 grams of marijuana; 10 tablets of the opiate hydrocodone; and about eight blue diazepam tablets.

Outside the culvert where Officer Bell had been shot, police located among other items 54.54 grams of methamphetamine, multiple baggies, and a glass-bead smoking pipe. Subsequent DNA analysis of one of the baggies showed defendant was a "possible source of the predominant DNA profile," with the possibility that this DNA matched another person in the Hispanic population being "one in two quintillion." [Footnote: A quintillion is the number 1 followed by 18 zeros.]

About 90 minutes after defendant's arrest, Officer Ford and other officers including a canine retraced defendant's steps in the area of the apartment complex in an effort to locate the missing gun. As they went down the apartment breezeway where Officer Ford had temporarily lost sight of defendant, the canine alerted to the ground near a fence. Officer Ford jumped up onto the fence and saw a gun lying on the ground, at the base of a fence. The gun was later determined to belong to Agent Carranza.

B. *Defense Evidence*

Defendant testified in his own defense. Defendant did not deny shooting Officer Bell but claimed he did so in self-defense. Defendant recalled the incident began when he was driving on the freeway and saw a line of police cars following behind him. Defendant took the Adams Avenue exit and then took police on what he described as a "little pursuit throughout Kensington." Defendant admitted he did not stop because he wanted to avoid being arrested on the outstanding warrants.

Once he came to a dead end, defendant jumped out of the car and ran into the canyon. As he was running, defendant saw the culvert. He testified he

went inside to avoid being caught, believing no officer would follow him. However, to his surprise he heard someone yell "stop" shortly after he ran into the culvert. Rather than stop, defendant kept running. Defendant heard this person yell "stop" again but according to defendant, this time the person also yelled, "Or I'll shoot." Defendant claimed this person allegedly never identified himself as a police officer, although defendant "imagined" he probably was a police officer. Defendant testified he in response stopped, put his hands up in the air, and said, "I give up."

Despite the darkness, defendant testified he could see this person had a "gun in his hand," causing defendant to "(freeze)." Because defendant was "frozen," he testified he was unable to follow the person's commands to get down on the ground. According to defendant, the person next fired his taser but missed defendant. In response, defendant said, "what the fuck. I give up." When asked why he did not get on his stomach as he was directed, defendant testified he was "just stuck" because this person was "going to kill (him) or something."

Defendant testified that the person approached him and tased him in the upper back; that the person next pushed him against the wall; that defendant in response volunteered that he was in possession of a gun located in his front waistband; and that the person disarmed him. Despite being disarmed, defendant testified the person again used the taser on him, hitting him above his left eyebrow. Defendant responded by knocking the taser out of the person's hand.

Defendant next saw the person pick up defendant's gun. The person then attempted to hit defendant with his own gun. As defendant raised his arm to block the blow, the gun went off and defendant saw the person fall "on his butt." According to defendant, the gun inexplicably went off a second time. When defendant saw the person drawn his own gun, defendant admitted firing "three shots at (the person's) arm," causing the person to drop his own gun. When the person tried to pick up the gun he had dropped, defendant testified that he fired two more shots at the person. It was then the person got up and ran out of the culvert. While still inside the culvert, defendant considered taking his own life but then thought about his wife and changed his mind.

(ECF No. 14-45 at 4-15.)

///

///

### III.    DISCUSSION

#### A.    Standard of Review

This Petition is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 ("AEDPA").  28 U.S.C. § 2254(d).  Pursuant to AEDPA, a state prisoner is not entitled to federal habeas relief on a claim that the state court adjudicated on the merits, unless that ruling: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or  "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Harrington v. Richter, 562 U.S. 86, 97-98 (2011), quoting 28 U.S.C. § 2254(d)(1)-(2).

A decision is "contrary to" clearly established law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 413 (2000).  A decision involves an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case."  Id.; Bruce v. Terhune, 376 F.3d 950, 953 (9th Cir. 2004).  With respect to section 2254(d), "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable– a substantially higher threshold."  Schriro v. Landrigan, 550 U.S. 465, 473 (2007), citing Williams, 529 U.S. at 410.  "State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"  Rice v. Collins, 546 U.S. 333, 338-39 (2006), quoting 28 U.S.C. § 2254(e)(1).

 "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Richter, 562 U.S. at 101, quoting Yarborough v. Alvarado, 541 U.S. 652, 664

(2004). "If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. . . . It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." <u>Richter</u>, 562 U.S. at 102.

In a habeas action, "[t]he petitioner carries the burden of proof." <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181 (2011), citing <u>Woodford v. Visciotti</u>, 537 U.S. 19, 25 (2002) (per curiam). However, "[p]risoner pro se pleadings are given the benefit of liberal construction." <u>Porter v. Ollison</u>, 620 F.3d 952, 958 (9th Cir. 2010), citing <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) (per curiam).

**B.   <u>Merits</u>**

In the sole claim in the Petition, Petitioner contends he "was denied a fundamental constitutional right when [sic] trial court erred in revoking his right to self-representation just prior to the start of trial." (ECF No. 1 at 6.) Respondent maintains habeas relief is unavailable because the state court adjudication of claim one on the merits was neither contrary to or an unreasonable application of clearly established federal law nor was it based on an unreasonable determination of the facts. (ECF No. 13 at 3.)

Petitioner presented this claim to the California Supreme Court in his petition for review. (ECF No. 14-48 at 19-22.) That petition was denied without a statement of reasoning or citation to authority. (ECF No. 14-49.) Petitioner also presented this claim to the California Court of Appeal on direct appeal. (ECF No. 14-40 at 23-51.) The state appellate court denied the claim on the merits in a written opinion. (ECF No. 14-45.)

The Supreme Court has indicated a presumption exists "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991); <u>see also</u> <u>Wilson v. Sellers</u>, 584 U.S. ___, 138 S.Ct. 1188, 1193 (2018) ("We conclude that federal habeas law employs a 'look through' presumption.") In the absence of any grounds in the record to undermine or rebut this presumption, the Court

will "look through" the state supreme court's silent denial of claim one to the reasoned opinion issued by the state appellate court.  See Ylst, 501 U.S. at 804 ("The essence of unexplained orders is that they say nothing.  We think that a presumption which gives them *no* effect- which simply 'looks through' them to the last reasoned decision- most nearly reflects the role they are ordinarily intended to play.") (footnote omitted).  With respect to Petitioner's claim, the state appellate court reasoned as follows:

A. *Additional Background*

In September 2014, following his preliminary hearing, defendant moved under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) to replace his court-appointed counsel. Defendant contended his court-appointed counsel was going on medical leave, he was being assigned new counsel, and he was in any event unhappy with his counsel because he had wanted testimony presented at the preliminary hearing to show evidence tampering by police with respect to the location and recovery of Agent Carranza's gun. The court denied the motion.

About a month later, defendant renewed his request for relief under *Marsden* because he claimed his newly appointed counsel refused to file a motion to refute among other things testimony at his preliminary hearing that he was a member of a certain criminal street gang. When the court denied this second motion, defendant stated he would file the motion himself. After the court advised defendant he had a constitutional right to represent himself and warned him against doing so, defendant stated, "I want to go pro per, please." The record shows the court instructed defendant to fill out the required form and requested the prosecutor return to the courtroom. After a brief recess, defense counsel informed the court that defendant had reconsidered and no longer wanted to represent himself.

In April 2015, defendant made his third *Marsden* motion. Defendant claimed that his previous court-appointed counsel out on medical leave had "appeared out of nowhere" at the last hearing and was again representing him, despite the fact she allegedly had been "dismissed" from his case. Seeking to clarify the issue, defense counsel noted that she had been on medical leave; that defendant was appointed new counsel as a result; that defendant had refused even to speak to that counsel; and that because she had returned from medical leave, it was decided for defendant's "benefit" that she would resume

his defense. Defense counsel ask the court to urge defendant to cooperate with her, as she wanted to help defendant.

When the court during the *Marsden* hearing asked defendant if he wanted to add anything, he replied "It's going to be the same thing. I'm not going to talk to her no more, I'm not going to deal with her no more." In response to the court's question why he did not believe he was being adequately represented, defendant stated that he had not been provided his "full discovery," a point he would make throughout the case, as he wanted "all the pictures, every note, everything." Defense counsel informed the court she had met with defendant a few days earlier and had asked him to write down the items he wanted. She further noted that defendant wanted "every picture," despite the fact many of the photographs were duplicative, which she noted was unnecessary and costly to reproduce.

In denying defendant's third *Marsden* motion, the court stated that it had known defense counsel a "long time" and she was "very good"; that it appeared the "problem" was defendant, not his attorney; and that, while it was his choice whether to cooperate with his attorney, not doing so put him in a "very difficult position." At the conclusion of the hearing, defendant asked the court if he could go "pro per" in order to "get all (his) discovery." The court informed defendant he needed to formalize that request and cautioned him against doing so merely because he was not receiving "duplicative discovery," which the court noted he would *not* receive even if he was self-represented. After the court told defendant he would get the discovery he was entitled to, defendant said, "that's fine" and withdrew his request to be self-represented.

At a June 5, 2015 hearing, defendant moved to proceed in propria persona. During this hearing, attorney Gary Gibson from the County of San Diego Multiple Conflicts Office stated that he had been assigned to defendant's case for about four weeks; that he had received all of the information and discovery from defendant's former attorney; that he had visited defendant on two prior occasions; and that both visits lasted about one or two minutes because defendant "terminated the visits" and said "he wished to go pro per both times." Gibson thus recommended the court grant defendant pro per status because it did not appear defendant would "be able to work with any attorney," as defendant wanted to make all of the decisions in his case, including tactical ones.

///

19cv1434-GPC (MSB)

On questioning by the court, defendant confirmed he wanted to proceed in pro per. Defendant again complained he was not being provided with "all" of the discovery, despite his requests for it. Gibson informed the court that defendant was asking for about 3,000 color photographs *and* that Gibson had agreed to meet with defendant and go through each picture on the computer so that defendant could decide which ones he wanted reproduced. Defendant nonetheless had refused Gibson's offer. The court cautioned defendant he was not going to get 3,000 photographs reproduced even if he was self-represented. Before taking a recess so that defendant could formalize his request, the court suggested defendant "think long and hard" about representing himself. Defendant in response said, "I'll be fine."

During the recess, defendant completed a waiver form that included about 15 admonitions regarding the "dangers and disadvantages of self-representation." (Capitalization omitted.) One such admonition provided: "I understand I must display proper courtroom decorum and any disruptive behavior on my part may cause the court to terminate my right to self-representation. If my pro per status is terminated, I will have to be represented by a lawyer appointed by the court who may then be required to take over the case at whatever stage the case is in. If this occurs, the attorney appointed by the court will be in a disadvantaged position and such a disadvantage will not be considered an issue for appeal in the event I am convicted."

After the proceeding resumed and after again cautioning defendant against proceeding pro per, the court "reluctantly" granted him pro per status. The court conditioned its decision on the appointment of "standby" counsel and a "legal runner" for defendant. Toward the conclusion of the hearing, defendant admitted he was not entitled to the reproduction of all 3,000 photographs contained on media disks already produced by the People.

As a result of defendant's pro per status, the prosecutor agreed to prepare an "independent set of the discovery" for him. The prosecutor also agreed to provide defendant the "media materials" and have them delivered by a runner. The court in response told the prosecutor he could deposit those materials in the court. At the conclusion of the hearing, the court reminded defendant he would not receive any "special treatment" and if he did not follow the rules expected of an attorney, the court could revoke is [sic] pro per status. Defendant responded he understood.

At a July 15, 2015 hearing, defendant argued he was not receiving the discovery promised him. The prosecutor noted that defendant already had

19cv1434-GPC (MSB)

been given about 1,800 pages of "paper discovery" and 32 disks in "media format," which included recorded statements of witnesses, photographs, and forensic analysis. Defendant confirmed he had in fact received these materials. During the hearing, defendant made supplemental discovery requests including for the "media broadcasts that were made during the preliminary hearing in this case."

At an August 26, 2015 hearing, defendant informed the court he had filed a discovery motion on August 12. Although neither the court nor the prosecutor had received the motion, the court as an accommodation offered to "dig it up." Defendant next complained the Office of Assigned Counsel (OAC) was refusing to provide him an investigator and a ballistic expert, noting the OAC wanted him "to write everything in detail." The court reminded defendant he had been warned that proceeding pro per would not be "easy." The court nonetheless agreed to call OAC on defendant's behalf regarding appointment of an investigator. When defendant also complained about not getting a transcript from a hearing before a different judge following the preliminary hearing, the court offered to have its own staff assist in obtaining this transcript, despite the fact the court perceived this transcript had little if anything to do with any issues in the case.

Finally, defendant stated he "needed" the transcript from the previous hearing when he was granted self-represented status. When asked by the court *why* he also needed this transcript, defendant merely repeated he "need(ed) it." Despite his inability to provide any reason for his need of this transcript, the court also agreed its staff would secure it. At the conclusion of the hearing, the prosecutor informed defendant that pursuant to section 1054, defendant needed to prepare an informal discovery request regarding what additional discovery, if any, he wanted. Thus, despite the court's earlier warning defendant would not be receiving any "special treatment" because of his pro per status, the record shows the court was doing its very best to accommodate defendant.

At the September 30, 2015 hearing, the prosecutor noted he still had not received defendant's August 12 motion. The prosecutor further noted he had received that morning an eight-page discovery request from defendant and defendant had indicated all items on pages one through three of the request already had been produced. The court indicated it had spoken to OAC on behalf of defendant, learned that defendant had been told what he needed to do, but that defendant had refused to file the "proper request" and otherwise follow OAC "rules" to get what he wanted.

Defendant replied he knew certain forms were required but he did not want to give the completed forms to a deputy sheriff who would "read (his) stuff" and impinge on his "confidentiality." Defendant also stated it was none of OAC's "business" how he went about his defense and all he wanted to do was speak to an investigator and a ballistics expert. As a further accommodation to defendant, the court again agreed to call OAC on his behalf and arrange for an investigator to meet with defendant.

The record shows at this hearing defendant continued to complain about not receiving certain discovery he had requested. The court responded OAC believed defendant was asking for "things" such as "manuals to the operation of certain machines" that were "totally . . . ridiculous to (his) case." Defendant reaffirmed his belief the prosecutor was refusing to turn over "a lot" of discovery to him.

Lauren Engram, a representative from OAC, appeared at the November 9, 2015 hearing. Engram informed the court that defendant had been assigned an investigator; that it was explained to defendant that any communication he makes with OAC had to be in writing; that defendant was "confused" about the process he needed to follow to obtain requested items; that an investigator met with defendant and agreed to take all of defendant's requests rather than have defendant give such requests to a deputy sheriff; and that despite doing so, defendant still had been unable to follow proper procedures.

Engram also informed the court that OAC already had acted on each request defendant had made; that in some instances OAC had denied such requests because defendant had failed to follow its rules and procedures; and that OAC had provided the transcripts defendant previously requested. Defendant disagreed, stating "I have not gotten nothing." The court continued the matter and instructed defendant to meet with his investigator before the next hearing and put his requests to OAC in writing. The court expressed its view that defendant was "dragging (his) feet" in preparing for the January 6, 2016 trial.

At the November 19, 2015 hearing, the prosecutor informed the court that defendant had been given 15 additional disks since the previous hearing. Michael Garcia, appearing on behalf of the OAC, noted that everything defendant had requested had been provided, but that defendant had made multiple requests for information and materials requiring a subpoena, including, by way of example only, police manuals and "manuals of tasers." Because defendant failed to subpoena these materials, OAC denied these

requests. Although Garcia told defendant *why* his requests had been denied, according to Garcia defendant again requested items without preparing the necessary subpoenas.

When the court inquired why defendant needed a taser manual, defendant merely responded, "I need (it)" and stated without such information, he would be unable to question the expert. The prosecutor noted that defendant already had been given everything the expert had relied on with respect to the taser used on the day of the shooting. Nonetheless, as an accommodation to defendant, the court ordered the prosecutor to "get" the manual of the taser used by Officer Bell and turn it over to defendant, even if it meant the prosecutor himself had to call the manufacturer.

Defendant next complained about information being redacted from various reports he had received. At this point, the court noted that it had read the preliminary hearing transcript; that in its view, the case was relatively straight-forward; and that defendant was purposely making the case more difficult than necessary by seeking to discover "a lot" of "irrelevant" information. When defendant argued the redacted information he sought involved a police informant who knew defendant was at a particular house shortly before the pursuit began, the court asked defendant why such information was relevant. Defendant responded, "(T)hey (i.e., the police) contributed to endangering the public. Why? They already knew I was there. They were already looking for me. They already had an informant providing them information about where I was at. An informant calls them and puts them there."

The court in response again noted such information was irrelevant to the charge of attempted murder of a police officer and "what took place in that culvert." After reviewing various items of discovery that would be provided to defendant, including third-party media information defendant wanted because he believed the *certified* preliminary hearing transcript allegedly was inaccurate, the court cautioned defendant to be ready for trial on January 6, 2016.

At the December 4, 2015 hearing, defendant again complained the *certified* preliminary hearing transcript was inaccurate. The court informed defendant that the transcript was certified and could not be corrected. The prosecutor reported he had obtained most of the discovery items defendant had requested but defendant was seeking additional discovery.

Defendant informed the court he intended to file a motion pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*) regarding the potential misconduct of "all of them (i.e., the police)." The court informed defendant he could file this motion and any others, which would be heard at the next scheduled hearing. Ostensibly as a courtesy, the prosecutor advised defendant there were "somewhat unusual" procedures defendant had to follow to file his *Pitchess* motion. The court echoed that sentiment and noted defendant had to subpoena any officers subject to that motion.

Near the conclusion of the hearing, the court once again warned defendant to be ready for trial on January 6. The court noted that it had been helping defendant as trial neared; that defendant had been given additional library time while in custody in order to prepare for trial; and that defendant had been receiving all the information he requested. The court further noted that once trial commenced, defendant needed to conduct himself as an attorney would; that the court could not help defendant or give him any "special favors"; and that it expected defendant to refrain from "acting up, yelling, screaming" and similar disruptive behaviors.

At the December 18, 2015 hearing, the court informed defendant he had not subpoenaed the "right people" in connection with his *Pitchess* motion. When the court reminded defendant he was repeatedly warned it "wasn't going to be easy to go pro per," defendant replied, "I told you I don't want to be my own lawyer." When the court offered to appoint him a "good" attorney, defendant stated, "I'm not going back to somebody, a piece of shit."

When the court noted neither of defendant's previous attorneys were a "piece of shit," defendant stated, "You know what, (defense counsel) was all right, you know, just her problem was—look, all I've every (*sic*) fucking wanted the whole time, all right, to this day all I ever wanted was my full discovery, that's it, you know. And I have some things, you know, in my case, that's it all right. That's all I wanted. Until this day I still can't get my full discovery." As the hearing continued, the prosecutor noted he was still in the process of redacting certain items from "radio communication channels" in discovery sought by defendant, although the record is silent *why* defendant needed such information.

Rather than deny defendant's *Pitchess* motion outright, as an accommodation the court offered to hear that motion and others in early January 2016, before trial started. In connection with the *Pitchess* motion, the court reminded defendant of the steps he needed to follow for the motion to

be heard. When defendant claimed he was unaware of that procedure, the court stated, "I think that I've bent over backward for you right now. Most judges would not do what I've been doing for you. I want you to get a fair trial. I want you to do what you think you need to do, but you're running up against these brick walls which the law says that you're not going to be given any type of, you know, instruction by me, you have to guide your own case. So far I have been helping."

When defendant again complained about the lack of discovery he allegedly had been provided, the record shows the prosecutor reviewed the voluminous amount of discovery defendant already had received. The prosecutor stated he also was in the process of providing defendant with additional discovery, including officer notes taken during interviews that defendant had sought, despite the fact defendant once again had not shown *why* or *how* such information was relevant to the issues in his case. Undeterred, defendant accused the court of being "unfair."

When the court asked defendant if he wanted to postpone the trial to give him additional time to prepare, the defendant responded, "No. I don't even care if you fucking pull these motions, I just want to go to trial. Let's go to trial." The court asked defendant if he was withdrawing the motions, including his *Pitchess* motion. Defendant changed his mind and asked the court to rule on the motions. The record shows the court, with the help of the prosecutor, advised defendant what he needed to do to subpoena the right people to have his *Pitchess* motion heard.

With regard to defendant's witness list, the court informed defendant he was not going to be able to call the chief of the San Diego Police at trial. When defendant objected and asked why the court was "picking" on "who's welcome from (his) witness list," the court noted if defendant wanted to subpoena the chief of police, then he could do so, but that the court ultimately would determine whether this witness or others witnesses defendant also had on his list (i.e., *former* chief of San Diego Police William Lansdowne) could testify.

At the conclusion of this hearing, the prosecution informed the court of certain conversations involving defendant that he found concerning, given defendant was self-represented. Specifically, the prosecutor noted in a November 9 jailhouse phone call between defendant and a woman named "Sandra," defendant told her, "If he gives me everything just let me review it and just push this shit back two to three months, three months at the most, you

know. I'm going to tell him to give me 30 days to review everything. If it's not much I need to figure out we'll set it down for 30 days later."

The prosecutor further noted that on November 11, defendant on a recorded phone call represented "'these fools . . . were forcing (him) to go to trial' and he was going to 'explain it all to the jury,' that, 'He's forcing me, right, that they won't give me all my shit,' and that, 'he fucking told that—I'm going to tell her that that fool ordered the other fucking fagot not to give me my shit. I'll just explain everything to the jury.'"

The following colloquy took place when defendant attempted to explain what he meant by these statements:

"The Court: Wait a minute. Hold it.

"Mr. Canela: Listen. Listen.

"The Court: No, you listen to me.

"Mr. Canela: Stop, stop. I'll let you talk —

"The Court: Do you want me to shut you down? Be quiet. I never have told anybody not to give you discovery. I don't know where you got that, but that's a lie.

"Mr. Canela: Okay. Then talk to him (i.e., Gibson)—

"The Court: I would never do that.

"Mr. Canela: Well, talk to him, then, don't tell me. I'm telling you what he told me.

"The Court: I'm telling you that didn't happen.

"Mr. Canela: Okay. Well, you tell him, don't tell me. I don't give a fuck.

"The Court: No, no, no. You're telling me, I'm saying it didn't happen. I'm telling you. I got nothing to do with him because you won't even talk to him.

19cv1434-GPC (MSB)

"Mr. Canela: Exactly. That's why I won't talk to him."

The prosecutor reported that later that same day (i.e., November 11), defendant stated on a recorded jailhouse line, "'I'm just going to tell them that that fool ordered the other fucking fagot not to give me my shit. I'll just explain everything to the jury. (¶) I know they were trying to force me to deal with the pro per, right, it's not going to happen. I'd rather not go prepared, rather fucking say "fuck it" and get that fucking fagot,' and there's some Spanish language there, 'fucking fool. The last lawyer I had, Mel Gibson, that fool Gibson, that fucking fagot, he tried to,' there is a conversation in Spanish, 'he tried to tell me, "if you don't listen they're going to take your shit next court date. You'll see. Watch." Okay. Well, ahead. That's all right. He can force me, force me to go to trial, I'm not tripping.'"

Concerned defendant intended to prejudice a jury inappropriately, the prosecutor further reported that on November 19 defendant told "Sandra": "'I just came back from Court, right. I already proved everything that's fucking—I showed him, the judge, everything. I fucking—everything. I showed him everything, and this sonofabitch, you know. You know, I really don't make fucking statements like that, you know, but I think he fucking'—

"'Who?' Sandra replies.

"Mr. Canela replies, 'The judge, man. I think this fool, the judge, is just racially profiling me and I think he is fucking—he's very prejudice. I showed him,' in parenthesis, '(the judge) everything . . . and he's still—it—it shows. I've just prove to him that they haven't done nothing for five fucking months. They're, in parenthesis, '(his request) has been moved to (OAC). They're approved since June. I showed him,' in parenthesis, '(the judge) everything, you know. I asked him for everything and it's still on me. It's still my fault that these fools, they prove it but they didn't give me shit. And I ask him,' parenthesis, '(the judge) to fucking fix my transcripts. The media was there, right, and he don't want to do it.'"

Despite such conversations with "Sandra," the record shows the court did not then revoke defendant's pro per status. Instead, the court confirmed that defendant had received "all" discovery "(e)xcept for the media," which was in the process of being redacted by the People.

On January 5, 2016—the day before trial, the court noted that it had received and reviewed defendant's "renewed" *Pitchess* motion among other

motions including ones for additional discovery. Erring on the side of caution because defendant was self-represented, the court granted defendant's *Pitchess* motion as to Officer Bell.

The court next turned to the issue of discovery. Defendant stated he was "still missing a lot of discovery" including "reports that—where officers were involved in directing other officers, meaning the sergeants, captains, everything that they were directing the other officers that—I believe they should have wrote a report if they're directing the officer or asked them for— ."

Defendant also complained he had not received various photographs he wanted reproduced from media disks. A representative from the OAC informed the court that defendant had submitted about 46 different requests to OAC and *none* of them sought reproduction of any pictures. The court ruled no such photographs would be forthcoming, finding defendant had ample time to obtain photographs and had previously refused the court's offer to continue the January 6 trial date.

The record shows the prosecutor represented to the court that all "paper discovery" provided by the San Diego Police Department had been turned over to defendant, other than discovery that the court reviewed in camera and ruled inadmissible. The prosecutor noted that defendant had received more than 2,400 pages of paper discovery, including the "notes" used by police to prepare their reports. Satisfied, the court stated to the prosecutor, "That's all I can ask of you." As the pretrial hearing continued, defendant complained he still was missing various other reports of officers, as noted. Defendant also provided the prosecutor and court with a one-page witness list.

The court reviewed defendant's witness list and asked defendant if he had any discovery to turn over to the prosecutor concerning witnesses not being called by the prosecutor. Defendant noted he had none, and further noted most of these additional witnesses were "friends and relatives" who would be "character witnesses" for defendant. Defendant admitted he had prepared no "notes" or anything along those lines regarding what these witnesses "will say or stand for."

Defendant next told the court the only "civilian" witness on his list that he wanted to call to testify was "Kelly Martinez." Defendant claimed this witness was a confidential informant, as was her husband and daughter. When the court asked defendant for an "offer of proof," defendant replied: "If I see

the report, there's probably something there, you know, that they already had the confidential informant inside the house. Okay. I don't know what—what was all bullshit or whatever it is that she said." Ever patient, the court agreed to review her possible testimony and then make a ruling.

The record shows the court next granted defendant's section 995 motion and struck the gang allegation, a motion defendant's former assigned counsel had prepared and which defendant had largely copied. As the hearing continued, the record shows the court once again warned defendant that he needed to follow the rules during trial, as defendant had made some comments in various motions that suggested defendant perhaps intended to inform the jury he was "not given this" and "not given that" and that he intended to make comments about various people/witnesses. When the court asked defendant if he understood, defendant in response said, "Yeah." Unsatisfied with this response, the court repeated if defendant understood he needed to follow the rules, to which defendant again responded, "Yeah." The court then noted: "I have a suspicion that you plan on doing some things in this trial that an attorney cannot do and you cannot do."

When defendant again complained about the lack of discovery, the court noted that "if two lawyers were sitting over there, they would receive the same information" defendant already had been given. Defendant, however, repeatedly disagreed with the court on this point, stating, "I doubt that." At that point, the court again warned defendant that if he "act(ed) out," he was "done" representing himself.

As the court was about to take a recess, defendant again asked the court about the photographs he wanted reprinted for trial. The court responded, "I'm done with that." Defendant informed the court he had "just" given the OAC representative a request for such photographs and was informed that request would be denied. The OAC representative informed the court that defendant's request was denied because defendant wanted more than *2,000* photographs reproduced.

Despite previously telling defendant it was "done" with this issue, the court *once again* attempted to accommodate defendant. The court told defendant to decide what photographs he intended to use at trial and suggested that number was somewhere in the range of 20 to 40, based on defendant's earlier representations.

///

Because defendant claimed he had not had enough time to review *all* the photographs, the record shows defendant insisted *all* of them should be reproduced. The court reminded defendant he had previously refused to accept the court's offer to continue the trial for a "couple of months." Defendant disagreed, stating he had asked for more time and the court instead had insisted the trial start on January 6. Defendant then instructed the court to "pull the transcript." The court noted it was "not pulling anything," to which defendant again said, "Pull the transcript."

The record shows the court *again* attempted to accommodate defendant in connection with the photographs, informing him a reasonable number could be reproduced. The following colloquy then took place:

"The Court: How many photos do you want printed out?

"Mr. Canela: I don't know. I just gave that number, but I don't know. I really don't know. I have to look at some of the photos.

"The Court: Fine. If you don't know, you don't know. Okay. All right.

"Mr. Canela: Where—where in the law does it say I can only get a certain amount of my discovery?

"The Court: Excuse me? What did you just say?

"Mr. Canela: Where—what case law, what law, what Penal Code, Evidence Code is there that says I can only get a certain amount of pictures, a certain amount of discovery?

"The Court: If you—they've asked you what pictures do you want?

"Mr. Canela: Okay. I'm saying now, all of them.

"The Court: Do you know the word onerous? That means it's too much work. They're willing to give you pictures that you want, all right?

"Mr. Canela: Okay, but—

"The Court: And you are refusing to give them that number. You're not getting 2,000 pictures.

"Mr. Canela: I'm giving them specifically—just print them out. They're there. Print them out. They're in discovery. It's discovery.

"The Court: This morning you said you wanted between 20 and 40.

"Mr. Canela: Yeah, but I'm saying, though, where—where is there a law that says

"The Court: Do you have specific—

"Mr. Canela: —I can only get—

"The Court: —a specific number of pictures that you want?

"Mr. Canela: But I'm asking you a question, though. Where in the law does it say I can only get a certain amount of pictures, a certain amount of evidence?

"The Court: You have been given all the pictures.

"Mr. Canela: But they haven't been printed out.

"The Court: You've been given them. If you want certain ones printed out, say which ones you want printed out. We'll try to get them to you. They will.

"Mr. Canela: Just print them out.

"The Court: We've covered this. We've covered it. I'm not going to talk about it anymore.

"Mr. Canela: *Don't get mad when I ask for them during trial.*

"The Court: I'm telling you—

"Mr. Canela: *I'm going to ask for them. I'm telling you now. I'm going to ask for them.*

"The Court: Okay. Fine. Pro per is revoked.

"Mr. Canela: Okay." (Italics added.)

The record shows after revoking defendant's pro per status and appointing defendant counsel, defendant warned the court that he was "(s)till going to say what (he's) got to say during trial, you know." The court responded if defendant acted up during trial, he would be removed from the courtroom and the trial would continue without him, to which defendant said, "That's okay." The record shows appointed counsel asked for a 90-day continuance.

Near the conclusion of the hearing, the court made a record as follows:

"All right. I want the record to reflect I'll—under many cases, California court's including California Supreme Court, *People v. Williams*, 58 Cal.4th 197, 250, the right to self-representation is not absolute. I have—the Court has to allow . . . person(s) to represent them(selves) if, in fact, the Court finds that they are of proper mental standing and they have an ability to represent themselves. However, it's not a license to abuse the dignity of the courtroom, neither is it a license to—not to comply with the rules of procedure and substantive law. In this Court's opinion, based on the contact with Mr. Canela over the last five to six months, it's my opinion, shown by what he said this—said to this Court, the way he's acted in this court, it's his intention to delay or disrupt proceedings."

The record shows defendant interrupted the court and said, "All I'm asking for is my discovery. That's it. That's all I'm asking for." After telling defendant to be quiet, the court continued, "He made very clear he intended to be disruptive, obstreperous, or disrespectful in his action." Undeterred, defendant again interrupted the court and said, "I'm going to continue to ask for it."

After a recess and despite being appointed counsel, defendant repeatedly asked the court to be allowed to return to his pro per status. When the court told defendant it was not going to revisit that issue, defendant stated, "Okay. Well, I'm going to ask you again and again in front of the jury . . . ." The court reminded defendant he could be removed from the courtroom if he did so. Defendant stated, "I don't give a fuck. Fuck you," to which the court responded, "Yeah, I know. Well, you're not the first person to say that."

At a status review hearing a week later, defendant appeared with appointed counsel who informed the court defendant wanted to continue as a pro per. The following colloquy then took place:

29

"The Court: I understand.

"Ms. Kinsey (appointed counsel): He is desirous to go forward in a pro per status.

"The Court: I understand. I revoked his pro per status based upon statements that he has made in court, based upon his actions. I made a decision and a finding that he will not follow the rules, he will not go along with the rulings. And he is doing everything he can to run it the Canela way, and that's not the way we do business here. I revoked his pro per. He is acting out. He has acted out. I made a decision and—

"Defendant: I asked you for fucking pictures.

"The Court: He overtalks me. Furthermore, I found that he was obstreperous and unreasonable and refused to follow the rules. That's why I revoked his pro per status and I will not let him come back pro per."

After the court agreed to defense counsel's request to continue the trial to May 2016, defendant stated he was then prepared to "go forward" with the trial. When the court noted defense counsel was not prepared to do so, defendant said, "I don't want her to represent me" and then began to argue about the "pictures" again. The court noted defendant had "played (his) little game long enough" and it was not going to revisit the issue of allowing him to continue pro per.

Not surprisingly, at the February 19 status hearing, defendant renewed his request to proceed in pro per. Appointed counsel informed the court defendant was prepared to start trial "today, tomorrow, next week." The court denied the request once again, noting it "gave Mr. Canela five or six months to get his act together, to work on his case and do whatever. He kept harping on the same thing over and over, and in his outbursts, he made comments about what he was going to do during the trial." The record shows defendant immediately blurted out, "I'm still going to do them," to which the court understandably responded, "See. Thank you. Keep going." The record shows defendant continued to argue with the court and complained he had not received all discovery, despite the court's repeated attempts to accommodate defendant and help him obtain such discovery over the course of many months.

///

30

19cv1434-GPC (MSB)

B. *Guiding Principles*

As noted, defendant's only contention on appeal is that the court abused its discretion and thus erred when it revoked his pro per status the day before trial. Based on the record as summarized *ante*, we conclude this contention borders on frivolous.

Under the Sixth Amendment, a defendant has the right to represent him- or herself. (*Faretta, supra,* 422 U.S. at p. 819; *People v. Becerra* (2016) 63 Cal.4th 511, 517 (*Becerra*).) As the trial court here correctly noted, that "right is not without limits, however. (Citation.) '"(The) government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his (or her) own lawyer."'" (*Becerra*, at p. 518; see *Faretta*, at p. 834, fn. 46 (noting the "right of self-representation is not a license to abuse the dignity of the courtroom"); *People v. Carson* (2005) 35 Cal.4th 1, 8 (*Carson*) (accord).)

Thus, a trial court "may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." (*Faretta, supra*, 422 U.S. at p. 834, fn. 46; *Carson, supra*, 35 Cal.4th at p. 10 (accord).) "Whenever 'deliberate dilatory or obstructive behavior' threatens to subvert 'the core concept of a trial' . . . or to compromise the court's ability to conduct a fair trial . . . the defendant's *Faretta* rights are subject to forfeiture." (*Carson*, at p. 10.) "'When determining whether termination is necessary and appropriate, the trial court should consider several factors in addition to the nature of the misconduct and its impact on the trial proceedings,' including: (1) 'the availability and suitability of alternative sanctions,' (2) 'whether the defendant has been warned that particular misconduct will result in termination of in propria persona status,' and (3) 'whether the defendant has "intentionally sought to disrupt and delay his (or her) trial."'" (*Becerra, supra*, 63 Cal.4th at p. 518, quoting *Carson, supra*, 35 Cal.4th at p. 10.)

"On review, we accord 'due deference to the trial court's assessment of the defendant's motives and sincerity as well as the nature and context of his (or her) misconduct and its impact on the integrity of the trial in determining whether termination of (self-representation) rights is necessary to maintain the fairness of the proceedings.' (Citation.) The court exercises considerable discretion in this regard and 'the exercise of that discretion "will not be disturbed in the absence of a strong showing of clear abuse."'" (*Becerra, supra*, 63 Cal.4th at p. 518.) "(T)he extent of a defendant's disruptive behavior may not be fully evident from the cold record," and we "accord( ) deference

to the trial court (because) it is in the best position to judge defendant's demeanor." (*People v. Welch* (1999) 20 Cal.4th 701, 735 (*Welch*).)

C. *Analysis*

The record contains overwhelming evidence to show the court properly exercised its broad discretion when it revoked defendant's pro per status on January 5, 2016, the day before trial. Indeed, the record shows that defendant engaged in conduct designed to "delay" the trial (see *Becerra*, *supra*, 63 Cal.4th at p. 518), as evidenced by his repeated requests for discovery of information the court found mostly "irrelevant" to the case, including by way of example only, defendant's "need" for police manuals; a taser manual; police officer notes from witness interviews; media broadcasts; hearing transcripts; police radio communications; and reproduction of *all* photographs—numbering in the thousands—already produced to him electronically.

What's more, in the days and months leading up to the trial, the record shows it was *defendant* who insisted he wanted to start trial in January 2016 and would be "fine," and it was *defendant* who refused the court's offer to continue the trial a "couple of months" in late Fall 2015. The day before trial, however, defendant did an about-face and claimed the *court* was forcing him to start trial despite being unprepared because he allegedly had insufficient time to review 2,000 photographs and decide which ones, if any, he intended to use. Defendant then repeatedly demanded the court "pull the transcript" to show he was being forced to trial, when it was—and is—abundantly clear from the record that it was *defendant* who was eager until the very end to start the trial.

The record also shows defendant intentionally engaged in conduct designed to "disrupt" the trial. (See *Becerra, supra*, 63 Cal.4th at p. 518.) Indeed, at the January 5 hearing, defendant repeatedly threatened to inform the jury that the court had refused to give him *all* of his "discovery" because the court denied his request for the reproduction of 2,000 electronically stored photographs, after defendant himself had represented earlier in that hearing he only wanted about 20 to 40 photographs reproduced.

The record also includes overwhelming evidence to support the court's finding that it "bent over backwards" to help defendant prepare for trial, including by way of example only, making phone calls to the OAC on defendant's behalf because he claimed he was being denied discovery and

access to an investigator; overseeing the preparation of transcripts from routine court hearings that defendant claimed he "needed" for his defense; allowing its courtroom to be used as a depository for discovery produced by the People; "dig(ging) up" motions filed by defendant that neither it nor the People had received; allowing defendant to bypass sheriff deputies and instead use defendant's investigator to deliver requests to the OAC; allowing defendant to refile his *Pitchess* motion and deciding *the merits* of that motion after defendant initially failed to follow the proper procedures for bringing such a motion; ensuring defendant received additional "library time" as the trial approached; and offering defendant a trial continuance of a "couple of months" to allow him additional time to prepare his case.

Despite the court's myriad attempts to accommodate and assist defendant to ensure he received a "fair trial," which the court noted, and the record shows, was its overarching concern, defendant responded by being repeatedly disrespectful to the court. For example, during the December 18 hearing, defendant used profanity toward the court, after accusing it of being "unfair" when the court reviewed documents in camera and ruled against him.

During this same hearing when the court offered to continue the trial because defendant had failed to subpoena the right individuals in connection with his *Pitchess* motion, defendant stated, "No" and then added he did not "care" if the court "fucking pull(ed this) motion()." Also during this hearing, defendant accused the court of "picking" who he could and could not call as a trial witness, even when it was clear defendant intended to call individuals who had little or no relevant information to offer in this case (i.e., the former chief of the San Diego Police Department).

What's more, at the January 5 pretrial hearing, defendant again accused the court of treating him unfairly when it denied his request to reproduce all 2,000 photographs, as discussed. Despite such accusations, the record shows the court continued to encourage defendant to decide what photographs he actually intended to use at trial, noting defendant could have such photographs reproduced if his request was reasonable. Also during this hearing, defendant interrupted the court and demanded answers to questions *he* posed to the court, including *why* he was not entitled to *all* discovery.

In light of defendant's disrespectful behavior toward, and treatment of, the court and his lack of courtroom decorum, for this separate reason we conclude the trial court properly revoked defendant's pro per status. (See *Welch, supra*, 20 Cal.4th at p. 735 (finding the court properly denied the

defendant's *Faretta* motion when, among other things, he "turned his back on the trial court when addressing it," "interrupted the trial court several times to argue what the court had declared to be a nonmeritorious point," and "refused to allow the court to speak and he refused several times to follow the court's admonishment of silence").)

Moreover, the record shows the court repeatedly warned defendant that if he continued to engage in conduct designed to delay and/or disrupt the trial, the court would revoke his pro per status. (Compare *Becerra, supra*, 63 Cal.4th at pp. 514–516, 518 (reversing revocation of pro per status when the trial court *without warning* revoked the defendant's pro per rights).) We note defendant also signed a superior court form which included in a section titled "dangers and disadvantages of self-representation" an admonishment warning defendant his pro per status could be revoked if he failed to "display proper courtroom decorum" or engaged in any "disruptive behavior." Thus, defendant hardly could have been surprised when the court revoked his self-representation status after he repeatedly threatened to tell the jury that the court allegedly was unfair in allegedly refusing to give him *all* discovery.

Finally, in reaching our decision we do not rely on defendant's conduct after the court revoked his pro per status. (See *People v. Doss* (2014) 230 Cal.App.4th 46, 58 (noting a court of review, as opposed to a trial court on remand, "may not rely on postruling conduct to affirm the trial court's improper revocation" of the defendant's pro per status).) Nonetheless, the record shows defendant continued to engage in obstreperous conduct after the court revoked his pro per status, including at the January 5 hearing when defendant told the court "fuck you" as the court was making its record, and at subsequent hearings when defendant appeared with appointed counsel and continued his outbursts and threats to disrupt the trial.

(ECF No. 14-45 at 16-43.)

In his habeas corpus petition, Petitioner "respectfully urges his convictions should be reversed because he was erroneously denied his fundamental constitutional right to self-representation when the trial court abused it's [sic] discretion and revoked petitioner's pro per status just prior to the start of trial without a specific and adequate warning, without consideration of alternative sanctions, without sufficient showing that petitioner was disruptive or dilatory in a manner that threatened to subvert the core concept of a trial or to compromise the court's ability to conduct a fair trial, and without making an adequate

record as to how appellant's misconduct would seriously threaten the core integrity of the trial." (ECF No. 1 at 8.)

"The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. . . . Although not stated in the Amendment in so many words, the right to self-representation-to make one's own defense personally–is thus necessarily implied by the structure of the Amendment." Faretta v. California, 422 U.S. 806, 819 (1975) (footnote omitted). The Supreme Court has further affirmed "an accused has a Sixth Amendment right to conduct his own defense, provided only that he knowingly and intelligently forgoes his right to counsel and that he is able and willing to abide by rules of procedure and courtroom protocol." McKaskle v. Wiggins, 465 U.S. 168, 173 (1984). In Faretta, the Supreme Court also acknowledged "the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." Faretta, 422 U.S. at 834 n.46, citing Illinois v. Allen, 397 U.S. 337 (1970). The Supreme Court stated: "The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law." Id.

Here, Petitioner's claim of error and abuse of discretion arising from the trial court's revocation and refusal to reinstate his pro per status is unpersuasive. It is evident from a review of the trial record, as well as set forth in ample and exhaustive detail by the state appellate court, Petitioner persistently failed to follow the rules and procedures set forth by the trial court and threatened on multiple occasions to disrupt the trial proceedings, including immediately prior to the revocation of his pro per status. Nor does Petitioner demonstrate the trial court failed to specifically and adequately warn Petitioner prior to revoking his pro per status. On the contrary, the record reflects the trial judge expressly warned Petitioner on numerous occasions throughout the pretrial proceedings that his behavior and actions could result in revocation.

For instance, on June 5, 2015, the date the trial court granted Petitioner's request to proceed pro per, the record reflects the trial court engaged in an extended exchange with

Petitioner, cautioning him about his choice to proceed pro per and advising him that while it was Petitioner's right to proceed pro per, the trial court felt it was not in his interest; the trial court also appointed standby counsel and admonished Petitioner: "If at any time during the proceedings I feel that you're violating whatever - - the rules that an attorney would have to do, I will revoke your status and Mr. Gibson will step in and take over the case," to which Petitioner replied: "That's fine."  (Augmented Reporter's Transcript ["AugRT"] 24, ECF No. 14-25, Lodgment No. 2.)  The trial court additionally advised Petitioner: "And, of course, understand this, if you in any way become obstreperous or whatever, then I'd also have to take that into consideration, not only removing your pro per status but it's possible for you to be removed from the courtroom during the trial.  [¶]  Do you understand that?" to which Petitioner stated: "That's fine."  (Id.)  That same day, June 5, 2015, Petitioner signed an acknowledgement and waiver form on the Faretta matter which included numerous admonitions which reflects Petitioner was advised and initialed he understood that: "I understand there is no entitlement to, nor will the court grant me, any special treatment or favors because I am representing myself.  I also understand the court cannot and will not give me any legal help or advice," that "I understand I must follow all substantive and procedural rules of law in the case," and that "I understand I must display proper courtroom decorum and any disruptive behavior on my part may cause the court to terminate my right to self-representation," as well as "I understand that any misconduct by my occurring outside of court may also result in restriction or termination of my pro per privileges or status."  (CT 341-43.)

In addition to the oral warnings provided by the trial court in the initial Faretta hearing and the written waiver signed by Petitioner, the record reflects the trial court advised Petitioner on multiple occasions to follow the rules and act appropriately, and warned Petitioner's behavior, inability to follow rules, or indications he intended to disrupt the trial proceedings could result in revocation of his pro per status.  During one pretrial discussion on September 30, 2015, concerning Petitioner's complaint that he was not being provided a ballistics expert or investigator, the trial court indicated: "I have been told that

you refused to file the proper request," and instructed Petitioner: "You have to follow the rules." (AugRT 157-58.) The trial court also stated: "Your road is going to be very rocky, sir, with the attitude and knowledge that you have. I suggest that you might want to reconsider the use of a lawyer," to which Petitioner said: "No," and the trial court responded: "All right. That's fine. I may take it away from you, understand that. If it comes to a point where I think you're unable to proceed because of your inability to follow the rules, I may take away your ability to represent yourself, which I can do." (AugRT 158-59.) On November 19, 2015, the trial court advised Petitioner about the "rules for the road" concerning the questioning of witnesses and other trial procedures, such as the lack of shackling and rules about standing up. (AugRT 335.) At this time, the trial court again informed Petitioner: "But understand something. You have acted up once. If you act up again - -" to which Petitioner stated: "I acted up?" and the trial court stated: "You've had some problems in the past. I'm not anticipating it, but you may get excited or upset during the process. Please don't act out." (AugRT 335-36.) To this, Petitioner replied: "I have not acted out in your courtroom." (AugRT 336.) On December 4, 2015, the trial court again advised Petitioner about courtroom procedures and stated: "I assume you will act properly during the trial. No acting up, no yelling, screaming, none of that. Okay? You understand?" to which Petitioner replied: "That's fine." (AugRT 411.)

The record also reflects, as the appellate court similarly noted, that Petitioner was unprepared to go forward with a December 18, 2015, motions hearing because he failed to subpoena the correct entities, the San Diego Police Department and City Attorney; when the trial court again asked if Petitioner wanted a lawyer, Petitioner declined. (AugRT 453-58.) At this same hearing, the prosecutor raised the matter of monitored jail phone calls that Petitioner had with Sandra in November 2015, in which Petitioner complained about not being given his discovery and repeatedly indicated he would just tell the jury; when the prosecutor voiced concerns that Petitioner would offer similar remarks in his opening statement, the trial court stated: "Opening statement is a wide-open situation. I don't know what he's going to stay [sic] in opening statement, and I'm not going to curb what he's

going to say," but also indicated: "As he says things if it's irrelevant or improper I will say it.  I'm not going to tell him what to say.  It's his business."  (AugRT 478-83.)  At the January 5, 2016, hearing, which was intended to be the day before trial commenced, the trial court granted Petitioner's <u>Pitchess</u> motion, noting that given Petitioner's pro per status, that it was "better to err on the side of caution."  (Reporter's Transcript ["RT"] 315.)  After discussing various other matters, Petitioner again raised the issue of printing photographs; the trial court pointed out that Petitioner had the disks and had to comply with procedures in order to get photographs printed.  (RT 340.)  To this, Petitioner stated: "I'm not going to get them? I'm going to ask you for them during trial.  Whenever I need to use something, I'm going to ask you in trial," to which the trial court responded: "Let me tell you something right now.  You're not going to ask me for anything in trial."  (RT 340-41.)  After further discussion on this issue and the need for a written request and list of photos, as well as ruling on other matters, the trial court again admonished Petitioner that comments to the jury, such as those Petitioner had earlier threatened, would result in immediate revocation of his pro per status, as follows:

> The Court: "Mr. Canela, I need to say a couple of things to you.  You made a couple of comments in your motions and whatever to me as to what you plan on - - to do during trial.  You're going to follow the rules.  And the rules are that evidence is prepared, it gets put before me or before the jury and by the People, and you get to cross-examine that information.  You don't get to say to the jury you weren't given this, you weren't given that, your comments about people, or whatever.  You understand me, sir?"

> Canela: "Yeah."

> The Court: "All right.  If you act out or you say anything like that, I will immediately revoke your pro per status and put an attorney in your place.  You understand me, sir?"

> Canela: "All right."

(RT 366-67.)  After further discussion about the photos and discovery, the trial court again gave another warning to Petitioner: "If you act out, you're done."  (RT 368.)  Petitioner

then indicated he wanted all 2,000 of the photos produced; when the trial court said that issue had been covered and would no longer be discussed, Petitioner stated: "Don't get mad when I ask for them during trial" and "I'm going to ask for them. I'm telling you now. I'm going to ask for them," to which the trial court replied: "Okay. Fine. Pro per is revoked." (RT 375-76.)

Again, <u>Faretta</u> itself plainly provides the trial court with discretion to revoke a defendant's pro per status for misconduct or failure to follow the rules of law. <u>See</u> <u>Faretta</u>, 422 U.S. at 834 n.46. In view of the trial court's repeated warnings to Petitioner that misbehavior or failure to follow proper procedures or rules could result in revocation of his pro per status, coupled with the numerous instances identified by the appellate court and reflected in the record, the Court finds no abuse of discretion or error in the trial court's decision to terminate Petitioner's pro per status. As the state appellate court correctly found, "the record shows the court repeatedly warned defendant that if he continued to engage in conduct designed to delay and/or disrupt the trial, the court would revoke his pro per status." (ECF No. 14-45 at 43.) The Court's own review of the record refutes any suggestion that Petitioner was insufficiently or inadequately advised that his behavior could result in revocation of his pro per status.

Nor does Petitioner explain what sort of alternate sanctions the trial court should have considered prior to revoking his pro per status or how any such failure to do so violated his federal constitutional rights. Given Petitioner's failure to follow procedures and explicit threats to disrupt the trial proceedings by asking the trial court for the "discovery" of the printed photos in front of the jury (which Petitioner had already been provided in electronic form) after the trial court's recurring advisements to Petitioner he risked revocation if he failed to follow proper procedures or behave appropriately, it is not at all clear what other sanction was plausibly available. <u>See</u> <u>e.g.</u> <u>United States v. Mack</u>, 362 F.3d 597, 599-601 (9th Cir. 2004) (finding structural error and reversing and remanding for new trial where trial judge removed pro se defendant from courtroom during trial proceedings for misbehavior, ceased questioning of witnesses, and precluded both

sides from presenting arguments to the jury, reasoning: "A defendant does not forfeit his right to representation at trial when he acts out.  He merely forfeits his right to represent himself in the proceeding.")  As Respondent reasonably points out: "Once Canela's pro per status was revoked and an attorney was appointed to represent him, the trial court had the option of trying Canela in absentia if he followed through with this threats [sic] during trial, an option not available if Canela remained pro per."  (ECF No. 13-1 at 32.)  On this record, the Court finds no error or abuse of discretion in any failure by the trial court to consider sanctions short of revocation.

The record also fails to support Petitioner's assertion the trial court revoked his pro per status in the absence of a satisfactory showing Petitioner was disruptive or without making an adequate record concerning how Petitioner's misconduct would threaten the integrity of the trial proceedings.  On the contrary, as discussed in detail above, the record clearly reflects Petitioner engaged in disruptive and dilatory behavior throughout pretrial proceedings, failed to follow the rules and procedures for motions, for requesting production of discovery, and for requesting investigative and expert assistance.  Petitioner also continually threatened to engage in disruptive behavior during the trial itself.

Moreover, while the conduct at issue took place prior to trial, the record clearly reflects the trial court's primary concern, and reason for revocation, was Petitioner's anticipated misbehavior at trial.  In state court, Petitioner offered the following argument: "[A]ppellant notes that the matter that gave rise to the revocation involved a pre-trial discovery dispute, not something occurring at trial," and argues that as such, the misconduct may not have justified revocation.  (ECF No. 14-40 at 43.)  Yet, it is plain from the record it was Petitioner's repeated indication he would continue asking for discovery during the trial proceedings and in front of the jury, an issue which had already been raised, discussed and dealt with during numerous pre-trial hearings, which spurred the trial court's termination of Petitioner's pro per status.  See United States v. Flewitt, 874 F.2d 669, 674 (9th Cir. 1989) ("Pretrial activity is relevant only if it affords a strong indication that the defendants will disrupt proceedings in the courtroom," noting that in Faretta, the Supreme

Court "was concerned only with the possibility of defendants '(using) the courtroom for deliberate disruption of their trials,'" as opposed to providing for revocation in the event a defendant did not prepare for trial), quoting <u>Faretta</u>, 422 U.S. at 834, n.46.  Nor was the hearing at issue here temporally removed from the trial proceedings by any significant measure; at the time of the pre-trial hearing where the trial court revoked Petitioner's pro per status, the trial was scheduled to start the very next day.  (RT 304, 372, 376.)  This reasoning similarly applies to any potential for error arising from the fact that some of Petitioner's misbehavior and threats took place outside of the courtroom, such as the recorded telephone conversations Petitioner had with Sandra, because the record reflects Petitioner also made those very same threats to disrupt the trial proceedings in open court and on the record.

In state court, Petitioner also challenged the propriety of the trial court's repeated admonition that self-representation was not wise or in Petitioner's best interests, arguing as follows: "Finally, it should be noted that whether or not the decision to proceed in pro per is wise or in the defendant's best interests is fundamentally irrelevant and not to be considered by the trial court when deciding whether to grant pro per status, revoke it after it has been granted, or refuse to reinstate it after a revocation." (ECF No. 14-40 at 49.)

Here, in denying one of Petitioner's numerous post-revocation requests to reinstate his pro per status, the trial court indicated: "I respect the pro per status because the appellate courts say I have to.  Personally I think it's not good because I've never seen a pro per do something good for himself.  It usually ends up worst [sic].  However, I think the pro per situation here as I previously said and I will state again would result in significant prejudice to Mr. Canela.  Furthermore I think it would result in a disruption of the orderly process of this Court and the justice system, which is unreasonable in these circumstances." (RT 603-04.)  The trial court also made similar statements before granting Petitioner's request to proceed pro per, for instance warning Petitioner as follows: "But there's just no way - - no way you could be prepared to handle a jury trial as difficult as this one.  You just can't.  Now, you have a right to do that, if you want." (AugRT 12.)  When Petitioner affirmed he

wanted to go pro per, and after repeated questioning, the following exchange took place:

> The Court: Okay. I'm going to approve the pro per, reluctantly.  I think it's -
> - I think it's in his worst interest, but I will do it - -

> The Defendant: Thank you.

> The Court: - - because the Supreme Court has said I have to do it.  And I
> horribly disagree with their decision.

(AugRT 13.)  At that same hearing, Petitioner's then-counsel also made a similar comment about the wisdom of Petitioner's pro per request.  (See AugRT 4) ("Counsel: But Mr. Canela appears to be competent, appears to be making a bad decision.")

Upon review, the record does not support a conclusion that Petitioner's best interests were part of the trial court's decision-making, as the trial court granted Petitioner's request to represent himself and the record also makes it abundantly clear the revocation was due to Petitioner's behavior and the prospect of distractions and obstructions at trial.  Again, after repeatedly warning Petitioner his misbehavior could result in revocation, it was Petitioner's threat in open court, made the day before trial proceedings were set to commence, stating he intended to ask for discovery at trial and in front of the jury, which ultimately resulted in the trial court's decision to revoke his pro per status.  As the trial court indicated for the record shortly after revoking Petitioner's pro per status, "the right to self-representation is not absolute," and stated "it's not a license to abuse the dignity of the courtroom, neither is it a license to - - not to comply with rules of procedure and substantive law.  In this Court's opinion, based on the contact with Mr. Canela over the last five to six months, it's my opinion, shown by what he said this - - said to this Court, the way he's acted in this court, it's his intention to delay or disrupt proceedings." (RT 379.)  The trial court also stated: "He made very clear he intended to be disruptive, obstreperous, or disrespectful in his action." (Id. at RT380.)

Moreover, the trial court reiterated this same reasoning in denying Petitioner's repeated requests to reinstate his pro per status.  For instance, in denying a reinstatement

request one week after the revocation, the trial court again noted: "I revoked his pro per status based upon statements that he has made in court, based upon his actions. I made a decision and a finding that he will not follow the rules, he will not go along with rulings," and that "I found that he was obstreperous and unreasonable and refused to follow the rules. That's why I revoked his pro per status, and I will not let him come back pro per." (RT 404-05.) The trial court made similar statements in denying a request to reinstate his pro per status several weeks after revocation, as follows: "I'm not going to reinstate it. I gave Mr. Canela five or six months to get his act together, to work on his case and do whatever. He kept harping on the same thing over and over, and in his outburst, he made comments about what he was going to do during the trial," and that: "What he was going to do was obviously completely against any rules of court or whatever. And I found that he's boisterous, he's obstreperous. He just wants to throw a wrench into the system, and I'm not going to allow it. That's why I took it away." (RT 503-04.)

Thus, to the extent Petitioner contends the trial court erred in considering potential prejudice to Petitioner or Petitioner's self-interest in the revocation decision and refusal to reinstate his pro per status, the record does not support that claim of error. While opining at several points that a decision to proceed pro per was often not in a defendant's best interests, the trial court also clearly recognized it was a defendant's decision to make, stating "the Court has to allow a person to represent themselves if, in fact, the Court finds that they are of proper mental standing and they have an ability to represent themselves." (RT 379.) It is evident from this Court's review of the trial court's comments on the wisdom of Petitioner's decision to proceed pro per, while mentioned by the trial court at several points during the proceedings, was not the impetus for the trial court's decision making on the matter.

Again, "[t]he right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law." Faretta, 422 U.S. at 834 n.46. Indeed, as the state appellate court recounted in detail, the record reflects Petitioner persistently engaged in activity intended

to both "delay" and "disrupt" the pretrial proceedings and explicitly threatened to continue such behavior during trial.  (See ECF No. 14-45 at 39-43.)  With respect to delay, the appellate court for instance noted Petitioner's "repeated requests for discovery of information the court found mostly 'irrelevant' to the case, including by way of example only, defendant's 'need' for police manuals; a taser manual; police officer notes from witness interviews; media broadcasts; hearing transcripts; police radio communications; and reproduction of *all* photographs—numbering in the thousands—already produced to him electronically."  (Id. at 39-40.)  With respect to Petitioner's intent to disrupt the trial proceedings, the appellate court noted for example "at the January 5 hearing, defendant repeatedly threatened to inform the jury that the court had refused to give him *all* of his 'discovery' because the court denied his request for the reproduction of 2,000 electronically stored photographs, after defendant himself had represented earlier in that hearing he only wanted about 20 to 40 photographs reproduced."  (Id. at 40.)

The fact remains Faretta explicitly provides that a defendant's right to represent himself may be revoked for the exact sort of behavior at issue here.  See Faretta, 422 U.S. at 834 n.46 ("[T]he trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct."), citing Allen, 397 U.S. 337.  The record in this case is awash with evidence of Petitioner's failure to follow clearly set forth court procedures and his disruptive behavior, as well as Petitioner's threats to engage in similar behavior in front of the jury at trial.  As such, the Court concludes the state court rejection of Petitioner's claim is neither contrary to, nor an unreasonable application of, Faretta.  Nor has Petitioner shown the state court decision was based on an unreasonable factual determination.  Petitioner fails to demonstrate a federal constitutional violation arising from the trial court's decision to revoke his pro per status.  Accordingly, habeas relief is not available on Petitioner's sole claim in the federal petition.

## C.   **Certificate of Appealability**

A petitioner may not appeal "the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court" except where "a

circuit justice or judge issues a certificate of appealability."  28 U.S.C. § 2253(c)(1)(A). "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C.A. foll. § 2254.  "A certificate of appealability should issue if 'reasonable jurists could debate whether' (1) the district court's assessment of the claim was debatable or wrong; or (2) the issue presented is 'adequate to deserve encouragement to proceed further.'"  Shoemaker v. Taylor, 730 F.3d 778, 790 (9th Cir. 2013), quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000).

The Court finds a Certificate of Appealability is not warranted in this case because the sole claim in this habeas action neither deserves encouragement to proceed further nor has Petitioner demonstrated jurists of reason could find the Court's adjudication of Petitioner's claim debatable or wrong.  See 28 U.S.C. 2253(c); Slack, 529 U.S. at 484. Accordingly, the Court **DENIES** a certificate of appealability.

## IV.   CONCLUSION AND ORDER

For the reasons stated above, the Petition for a Writ of Habeas Corpus is **DENIED**. The Court **DENIES** a Certificate of Appealability.

**IT IS SO ORDERED.**

Dated:  July 28, 2023

Hon. Gonzalo P. Curiel
United States District Judge

19cv1434-GPC (MSB)